The Honorable, the judges of the United States Court of Appeals for the Fourth Circuit. Oyez! Oyez! Oyez! All persons having any manner or form of business before the Honorable, the United States Court of Appeals for the Fourth Circuit, are admonished to give their attention. The Court is now sitting. God save the United States and this Honorable Court. Be seated. Welcome, everyone, to the Fourth Circuit this morning. It's good to have you here. And we look forward to the arguments in these four cases, and particularly in the first case, Neal v. East Carolina University. Mr. Barfield. Please, Court. Your Honor, in this case, prior to the onset and exhibition of symptoms of mental illness... You can take your mask off if you want. Prior to the onset... I can hear you better. Yeah. Prior to the onset of her mental illness symptoms in the spring of 2015, Olivia Neal was going to graduate. She was going to get her MSW degree. All of the things that were said about her by ECU when she was dismissed regarding what may have happened in 2013, what may have happened in 2014, none of those things, as of February 10th, 2015, were going to keep her from graduating and getting her degree. Why do you say that? Well, Judge, what we know is, is that despite in, say, the fall of 2014, there having been some issues, which I think are under contesting exactly what happened in 2014, but when we were done at the end of 2014, that grade of A that's given in the field course is not just an accident. One of the things that ECU emphasizes is that, well, we have a professionalism component to our program, and that's right. The thing about the grades, though, in this case, are that the grade specifically incorporates that professionalism component. That grade primarily is derived from the learning agreement, and we know that the learning agreement has two specific areas in which the student is measured specifically with respect to professionalism, carrying oneself as a professional, acting professional in dealing with clients, with other professionals, and so forth in your field practice. We know that in 2014, she was graded at the highest four and five levels on those measures of professionalism. So the grade in this case at the end of 2014 really means more than it might mean in some other professionalism cases where the grading is separated out. You get an academic grade here, but we're assessing you professionally over here. In this case, that assessment of professionalism is part of that grade. So that's part of the field work, but not necessarily part of the rest of the curriculum or learning experience. That grade of A that you get at the end of the term on that field seminar, which includes the field practice, is a combination of your clinical grading and your academic grading. Moving forward to 2015, though, didn't she admit to several instances of unprofessional conduct in February of 2015? Certainly did, and there's no question that. And so if professionalism is a component of continuing in the program, which I think I heard you say professionalism is a component of it, why isn't that enough for the university to have dismissed her from the program? Because in this particular case, this particular incident or this period of about two to three weeks was a transitory condition recognizing that. Didn't she assault her sister in 2013 or 2014? She did not. She was charged, but the record would show that she would. That case was dismissed. So the conduct in 2015 was apart and separate from anything that they've ever alleged occurred in 2013 or 2014. Moreover, up until. Why do you say that? I mean, you have these continuing instances over several years of aberrant behavior. Why do you say it's different in 2015? I mean, the degree might be different, but it seems like the character of the acts is somewhat similar through the years. Well, in this particular case, I think that there is a different character in the acts in the sense that in 2015, these are clearly recognized by the faculty and then later diagnosed as specifically manic behaviors, secondary to a specific disease, bipolar disease. That's not true with anything that was alleged for 2014, 2013 before. And in this particular case, I think the most important issue we address here for summary judgment purposes is this, the most important factors. In fact, the factors that the faculty describes both in their affidavits and in the most important factors that they relied upon to determine that she didn't meet the professionalism component or a, she missed too many classes and supervisions. And B, she was impaired in such a fashion so that they could predict that her interactions with others in the field and clinical practice was going to be impaired in the future. And was going to be unprofessional because she had behaved unprofessionally with several of the professors and others. And she conceded that, right? Correct. But in this case, the evidence is also there that this was a condition that was treatable and was true. ECU faculty has acknowledged in their affidavits that a treatable mental health condition that may have caused a transitory or temporary, you know, conduct problem is not by itself grounds for dismissal. They say, well, we actually allow people to graduate with these kinds of issues for as long as they're treatable. The code of social work, the code of ethics for social work specifically addresses that. It says, if you should become impaired because of a mental illness issue, then what you do is you step back. When was it that she told them she had a mental illness? Well, she didn't tell them until she came back with the note from the doctor. Until after they had terminated her from the program, correct? That's correct. But the termination wasn't fine. So at this point they certainly could have. But the university was not made aware by her that she had a mental illness or any need for any accommodation for that disability prior to her termination from the program. Correct. Correct. But again, we don't contend that she was disabled because she's it's a temporary condition, not a persistent disabling condition. She didn't need an accommodation. She needed to be treated like any other student who had a temporary physical or mental condition. And the, and the deposition or the affidavit of a professor, Abby Carpenter, Carpenter Abbey said, well, we that's right. It's the usual practice of this, this program that if you're, if you missed some classes, if you had to make up some work, you'd be allowed to do so. The point here in it not being final is that the, the ECU appeals policy specifically says that this dismissal from the program was not to become effective until the appeal was resolved. She had a right to continue in the program under their policy through the rest of the semester, or at least until the appeal was. So we're here on summary judgment. Can you just succinctly tell us, what do you say are the factual disputes that barred summary judgment? There are two essential ones. The first one is, did she miss any classes or an excessive class? All of their affidavits, their notice, all of it relies on and says, it's actually dispositive that she missed too many classes to graduate. She makes too many classes to make up the work. When in fact, the record is clear that she had absolutely one absence in the entire semester up to the time of her dismissal. So what about, what about the stipulation on page 893 of the appendix? Plaintiff failed to attend Dr. Yoon's class with no notification. Plaintiff also failed to attend Dr. Carawan's field class seminar with no notice. And you stipulated to that. And that was on March 3rd while she was in the hospital. And that is the only class that she missed. The other two classes that they referenced, they keep saying she missed too many classes, but the other two classes were never held. Those classes were on February 17th and February 24th. No classes were held on February 17th. No classes were held on February 24th. So that's the fact. They're depending upon a contention in their own notice and in their own declarations that she missed all these classes and she missed too many classes. But in fact, she missed one. Dr. Yoon's syllabus says you can miss one, no penalty. There's no penalty for one. If it was, it would be excused while she was in the hospital. Dr. Yoon's class says you missed three, you get an F. But again, she didn't miss three. She missed one. And that's a huge factual dispute in this case. And one, frankly, which the evidence is all in favor of the plaintiff. The second factual issue, very important, is the contention that she missed field supervisions. Likewise, the record is clear. She didn't miss any field supervisions until she was in the hospital. If you go through the email record from February 10th all the way through the time of her dismissal on March 17th, there is no reference in any of the many emails that she failed to attend or show up for a field supervision. Not once. There are references to field supervisions again being canceled because of weather. There are references to her asking for field supervisions to be set, but again, because of things out of her control, they weren't held. But on the factual record, the faculty themselves say the most important thing after too many classes were missed is she didn't have field supervision. Well, the record just simply doesn't support that. The record supports that she did have field supervision, again, until she was hospitalized. And again, up until the time they realized she was hospitalized, they weren't actually talking about dismissing her. They were talking about what we can do to help her because she has this temporary mental health crisis. And when it's said that she didn't tell them that she was suffering from mental illness, the record is replete. If I could just go back, what about her testimony? The question was, did you also miss any classes in the fall of 2014? It's possible. How does that create a factual dispute? Well, it doesn't ask to 2014. In 2014, she certainly didn't miss any significant number of classes. She got an A in both of her. So, obviously, whatever the record would show for 2014, it was nothing significant about missing classes. The missing classes issue really only comes up. In fact, even when they had the ARC meeting in 2014, if you read the emails leading up to that, they don't reference her missing classes. There's a lot of things that they reference, but not missing classes. So, the bottom line is that the missing classes issue only arises in 2015, and the factual record supports plaintiff's position that she missed one. But the record also supports the factual position on the plaintiff's side that she didn't miss field supervisions of her own accord. Most importantly, they also relied upon and said, well, you weren't attending your field. Well, that's just simply false. Again, the factual issue in the case favors the plaintiff. The records from the House of Fordham show she was attending her field placement. All of the evidence from the people who supervised her at the House of Fordham is to the effect that she never missed any of it, except when she was hospitalized. All of the record from the House of Fordham is to the effect that she was exemplary in all of her interactions with all of the clients and other professions. In other words, as a factual issue in the case, the ECU's position is, well, we rely on the idea that you're certainly going to interact back with clients and other professionals. And we say that that already started by the time that we dismissed her. But in fact, the record is that hadn't started. It never happened. And there's no record, there's no evidence anywhere in the record from 2014 or 2015 of any improper, inappropriate actions or activities in her field clinical work. So those are two things that they relied upon heavily. Absences from class, record doesn't support it. Didn't go to field supervision, record doesn't support it. In our minds, certainly going to be having inappropriate interactions with your field placement. Record doesn't support it. The record supports the opposite conclusion. In fact, in this case. What about our opinion in Halpern, where we said that the law does not require the school to ignore misconduct that has occurred because the student subsequently asserts it was the result of a disability. That sounds like the argument you're making now. The misconduct should be excused because it was the result of a transitory mental illness. We're not arguing that the conduct should be ignored. We're arguing that in this particular case, because there are disputes of fact of which they relied upon. They didn't just rely upon the incidents on February 10th or 24th and 25th. That's not the things that they relied upon. Their record and reasoning was much larger. We don't say that they should ignore this. We say that this case is different from basically virtually every other professional school case in that number one, there is a dispute of bare material facts. Facts that they contend are material. If you look at Halpern, there was no issue, no disputed facts in that case. Halpern was a persistent course of conduct over many years. He failed courses. She never did. In Halpern's case, it's clear that his conduct was willful. That is the conduct that was specifically at issue in that case was willful conduct. Here, when we talk about the conduct for mental illness, it's clearly not willful conduct. Most importantly, it's transitory. That's what I think makes it different. I'm still not quite sure why you say it's transitory, because when you look back at what happened, she withdrew from school in the spring of 2013. She was readmitted in the fall of 2014, even though there was a policy that you had to start over. They let her go in with credit for her first semester, so that gave her a second chance. Then shortly after the semester began, they had one of these anarchy committees because of the difficulty she was having. She made agreements to improve her conduct, so they gave her a third chance. Then we come into early 2015, and it seems like now what you want is a fourth chance. The point I would make about that argument goes to the issue of whether there's to be given deference. We don't have the case. I didn't find the case. I don't know if the case is there. Do they get deference if they specifically rely in exercising their judgment on facts that aren't true? This is the issue we have here. Are they entitled to the deference that we gave in Halpern, when in Halpern we all agree on what the fact is? Here we have very important to them facts they said were most important that were wrong. What deference is to be accorded to that termination when it's based on misstatement of the actual underlying relevant facts? I think that's what's most important here. Those facts are really in dispute, and the faculty said that those are the facts that matter. Thank you. Thank you, Mr. Barfield. Ms. Totten? May it please the court. My name is Vanessa Totten, and I am from the North Carolina Department of Justice. I represent the athlete East Carolina University in this matter. ECU respectfully requests that this court affirm the district court September 28th, 2020, order granting summary judgment on Affluent Olivia Neal's disability discrimination claim under the Americans with Disability Act. Neal was a graduate student at the East Carolina School of Social Work master's program, who was dismissed in spring 2015 for failure to meet the program requirements. During her enrollment, Neal engaged in a pattern of misconduct that created an environment that was disrupted to the university, faculty, staff, and students. The district court order should be affirmed for three reasons. The first reason, the undisputed and stipulated pattern of misconduct negates Neal's ADA claim. Two, the district court's order, which relied heavily on Neal's stipulated facts, properly determined that there is no general issue of material facts. And three. Mr. Barfield specified two, he says material facts in dispute. How do you deal with those? The two particular ones that he mentioned was her attendance. The first thing she stipulated to her that she missed classes, in which your honors is plural or a single class. I'm sorry. So she has multiple classes that she stipulated to. She also, which, but what she did, and Mr. Barfield says you missed one class. And the record. It actually shows that she missed the required number of field placements.  as you can see here, this is provisions for a time period where she was not attending. Her required field placement. That's stipulated on. The joint appendix, 893 at section 1 0 7. 894. As well, section that section. 113. 114. She also missed classes that you got. As your honors pointed out with. Dr, you and with Dr. Holloway, which was on pages. As far as emails about this, too, which is 183 through 184. And 187, excuse me, 1183 to 1184. And then also 1187 to 1188, which were some of the classes that she missed. She also missed assignments, which she does not dispute as well. Well, I'm talking about the two specific disputes that he identified. You're saying they don't exist. Correct. So there is a dispute between parties. Disputes of fact. For what trials are made up. So there isn't a list. They're immaterial. They're immature in the sense that she stipulated to majority. So you saying that she stipulated that he's simply wrong. And telling us that disputes of fact. Well, there is no disputes of facts because she stipulated. And the way, as far as. I mean, let me start back. So in the heartburn case, it says that misconduct, even misconduct related to a disability is not itself a disability. It may be a basis for dismissal. And this particular case, She stipulated to the fact that in the. Don't appendix, which is located on 875 through 913. That she did miss classes. Class says plural or 1 class. I only see a stipulation for 1 class and that's a paragraph. 108 on J 893. Is there another class? She stipulated she missed other than. Dr. 3rd class. So, she also stipulated that she missed. But as I mentioned earlier, the field supervision, which was part of our coursework, and that she was not attending her field placement, which earlier, which paragraphs are those that is joined appendix 893. Section 107. Join appendix 894. Sections 113 through 14. And she also. Neal submitted an affidavit in this, in this particular case. From Lynn Tyndall, who was from the house of. Which admits in her declaration that in spring 2015, Neil went missing. It was not responding to communication. And that was in her own decoration, which is on the join appendix on 200. And. 200 excuse me, to 2,641, section 15 of her and her actually. So, what was your after the reference to. 893 paragraph 107, which is the field visit on March the. 3rd, what was the 2nd reference? I just didn't get. There was other stipulated facts on 894. Section 113 to 114. And those are also. Right. And then she also submitted her affidavit. As well. So, 114 is from February 12th to March 16th. She should have had at least 4. Supervisory sessions. And she had not. Okay. And then again, her own declaration from Lynn Tyndall said that she was not showing up. To build placement. On Donna. And with those facts, none of that was disputed. You're saying there are no, you say there are no disputes in fact. Or if there are, you gave her the benefit of right. You had to. Yeah, or summary judgment. Yeah, but she also, the court gave the benefit. The right, the court had to give her the benefit. Of the facts. In the construing and dealing with the summary judgment. A majority of the summary judgment order, as you will notice. He actually cited to her stipulations. So these were. This is what she stipulated to. And as far as Linda Tyndall. When that was cited, that was her own declaration that she submitted. In support of her case. Now. The other question was that I think. That was mentioned your honors was about. She got a, I believe that was something else that was brought up in fall 2014. That was actually after she had faculty assistance. As your honors correctly. Mentioned earlier in fall 2014. She was referred to a admissions and retention committee meeting. And that was after she was charged with assaulting her sister. Correct. Yes. If you actually look. And. In regards to that fact, if you look in. The Jordan appendix. On 888 through. 889, which are section 73 and 74. This is this is where she was referred to the office of student rights and responsibilities. After she was an assault, she was assaulted after she was arrested. For an altercation involving her sister. And as a result of that incident, she was required to submit a counseling verification form. Which was separate and apart from the actual any criminal proceeding. And she simply. Is that you're not disputing that generally she's made. Good grades academic. With faculty assistant in regards. But you're not you're not saying that. She was making. There's no allegation that she made these and that's why. She was discharged. So, I'm in regards to the fall to answer your question, your honor. I'm in regards to the fall 2014. She was missing assignments. She was not coming to class. When she was referred to the. 1st, a mission and retention committee meeting. Because she said that she were correct to prepare the faculty. But even if all that's. Accurate for that. Isn't it fair to say generally. Except for the time she was. Or however you want to characterize it. She generally had good academic. Right. That's not a trick question. Yeah. Based on the facts and stipulations. Her grades were generally good. But with that said, your honor. It was a 3.94 was her grade point average. When she was terminated from the program. Correct. I know these other grades didn't. Count the last 2 grades, but. Yeah, I know that at the end of the semester, she, there were some incomplete at that time here. But she had a good student. He was a fairly good student. He was a very good student. Yeah, there's faculty assistance. You're talking about. Something wrong with students getting faculty. I thought that's what the faculty was there for. They're there to give faculty student assistance. But I would like to point out. In her stipulation. She says, as soon as she stipulates a student's academic performance. Is not judged solely on grades, but their professionalism. That is in the joint appendix at 881. Sections, 33 and 45. With that said. This court and. Shane versus University of Maryland medical systems corporations. It said 1 may achieve high marks throughout 1's education. And still not be able to perform the central functions of her job. And in that case, the position that was dismissed. I actually did have high marks, but they didn't have, they didn't meet. He did not meet the professional requirement. Professionalism requirement. He also turned in late submissions of assignments. And the faculty had a system as well. And his classwork, which is similar to the facts in this. And that case, they actually upheld it. I think the content. In this case. It's very important. I'm going to read this. Neil was a graduate student. To become a health care provider. As a, as a clinical social worker. Who will be responsible for serving. A vulnerable population. Often facing life. And death situation. And who are at risk of harming themselves and others. And Neil stipulates masters program. Students must exhibit professional judgment. And self-awareness of their own personal problem. It is expected that students act. In accordance with the same ethical. And professional standards applicable to the profession. Social worker clinicians must ensure. The emphasis is always on the wellbeing. The best interest of the client. And not themselves. As a student. As mentioned earlier. As students, academic performance is not judged solely on grades. But. They're professionalism. For instance. The Harping case was mentioned earlier. And in this case, it. It said clearly. Misconduct, even misconduct related to a disability. Is not itself a disability. And maybe a basis. For dismissal. Similarly. And. Versus Marshall university board of. Which is also a 4th circuit case. That said that in that, in this case, the court. Also upheld dismissal of a claim. Where a medical student was dismissed. But I'm professional conduct. Here is mentioned earlier. Miss. Neil actually stipulated. To. An overwhelming volume of misconduct. Given the time strings, I cannot say every single. Misconduct, but I would just like to summarize a few. And the fall 2014, as mentioned earlier, she was. Referred to the 1st admission and retention permitting meeting. Which is convened when a student is not meeting. The program requirement. To determine whether the student student will be terminated. Some of the facts leading up to that. Was involved 2013. Neil stopped attending class and was distracted and build placement. And fall 2014, she was missing assignments as mentioned earlier. It was also mentioned earlier that she was referred to the student rights. And responsibility for altercation involving her sister. Where she had to submit a counseling for. She also submitted. I'm excuse me stipulated that there was a time period and fall 2014. Where she was on the phone and every class. And a professor had to warn her. That her behavior was distracting. Other students and directed her to get off the phone. But she was given another chance. She was allowed to continue the program. She was warned. To improve the result and her dismissal. Neil. Fail to improve her conduct. And performance. And continue to exhibit a pattern of misconduct. Which led to a 2nd mission and retention. Committee meeting being convened. Leading up to that, in addition to the prior. This kind of, she had missing assignment. When the office of student rights and responsibilities followed up. About the overdue counseling form due from fall 2014. Neil left the unprofessional voicemail. And she also, she also sent. An unprofessional email. She also stipulated that she sent an unprofessional video. To the faculty of her yelling at her parents. There was also confrontations with the faculty. The 1st, 1 was the February 10th, 2015. Where she entered her professor's office. And again, this is stipulated. And engage in disrespectful. And unprofessional conduct for over 2 hours. During this time, the professor was able to leave the office. And Neil told him that she was staying in front of his car. To prevent him from leaving the staff parking lot. Other faculty and staff had to intervene. Now, there was another incident in fall 2015. Where her field instructing professor followed up with her. To check on her, and she told the professor to shut up. And listen. Now, there were, as mentioned earlier, she also had missed. On the card number field supervision. Which stipulated in the record. And that she also fell to 10 classes. And did not notify the instructors. And follow up when they try to communicate with her. Now, these are just a few examples of the stipulated. And undisputed facts that are, this is not a complete record. Now, argumentatively, one incident of misconduct. Would be sufficient for dismissal. But when you consider Neil's overwhelming pattern of misconduct. No argument can be made that her dismissal was not justified. Now, in regards to this, the dismissal. There are two legal principles. One that we've already discussed. Misconduct, even misconduct related to a disability. Is not itself a disability. And may be a basis for dismissal. Which is the Harpin case, the Zellman case. And several other court of appeals cases. But another principle that needs to be emphasized. Is something that was alluded to earlier. Neil's request for a readmission after the dismissal. Is not a disability. A combination, but a second chance. In this case, a fifth chance. To control her unprofessional conduct. The federal courts have repeatedly held. The denial of such a request is not a cause of action on the ADA. And that's the Harpin, the Zellman case. And as well as followed by several sister courts. Such as Rose versus Lasky. Which, in that case, they. Was denied by the U.S. Supreme Court concerning that. But it holds the same principle. And turn into the second point. The district court, which relied heavily on Neil stipulated facts. Properly determined that there was no. General issues and material facts. Did y'all argue this case and for the district court. The court decided on a record. It was decided on the record. This is the first time it's been argued. And the record is oversight. It's very detailed. And the eastern distance, as mentioned earlier, the eastern district, North Carolina. And have stipulated facts. Which is, I know you need to some from some districts. So there was a whole. Stipulation of facts. Now. With the remaining time, I would just like to highlight a few things. First, in regards to, I think. Earlier, if I remember correctly, it was mentioned about how other students had. Not miss or miss classes. There's no evidence of any alleged students that were similar. Situated in this case. The same level where they had exhibit the same level misconduct. And academic deficiencies. That they failed to communicate with faculty doing a critical. Time here when faculty were deciding their continued. Enrollment status in the program that they were referred to the missions. And retention committee, or the. Or that faculty repeatedly provide assistance. With classwork and internship for them to stay. In the program, and as your honors correctly pointed out. In this case, you see you correctly repeatedly. Try to work with. With bill and. And she even stipulate, but Neil stipulates. That faculty in a graduate program, such as. Has a duty to perform a gatekeeping function. To ensure that only competent petitioners. Gradually fulfilling this duty requires programs. Not to graduate students who exhibit behavior. That could pose a danger to the well, being a vulnerable social work. She stipulated that on 878. Page 879 section 23. I think that my time is running out. And I just quickly make my very last point. Briefly. My final point is that the district. Correctly applies this court's precedents. That difference should be given to the university's academic judgment. Especially health care providers. The Supreme court held a region versus University of Michigan. That courts may not override. And I can do it judgment. Unless it is such as essential part, but accepted. I could demonstrate that the person. Or committee responsible did not actually exercise personal judgment. This court has held is especially true. When it comes to respect to academic decisions. That are made involving students that are entering the health care profession. Because conferring such a degree. Is a testing that the students are qualified to deal with potentially. Life and death situations, which is the heart. And easy here properly. Follow their state academic standards. A school is not required to graduate a student who cannot meet this requirement. The Supreme court and Southeastern community college of Davis held that. Anti-discrimination law. Do not require education institution to lower or to. Effect substantial modification of standards. For students. And I, your honors would again, like to. Respectfully for these reason requests that. The district court decision in his entirety. There are no further questions. I would like to thank you. Thank you for your attention. Thank you very much. We appreciate it. Mr. Barfield. Judge. Made a statement. I think it's very important. She said, judge Brit looked at both sides. That's exactly what happened. With both sides and took one. First point. Stipulation that she should have had for supervision. Was simply a stipulation acknowledging that that was the schedule. She didn't stipulate that she missed any supervisions. On account of her own fault. I'll direct the court's attention to the record. Particularly at pages. 1161 to 68. 1182 to 1189. And also in 1123 to 1154. And this is the section of time in which we're talking among the faculty about the issue. And some of those emails, their emails to and from. Ms. Neal and Ms. Carraway. Professor Carraway about field. Visits. And professor Pearson about field supervisions. And in none of those emails. Does either professor Carraway or professor Pearson ever suggest at all. That, by the way, you've missed supervisions because you missed them. They say we've missed them because we, we had weather. We had this issue, whatever. On February 20. There was an exchange. In which they're trying to, in fact, schedule field visits and says, well, we weren't able to meet last week. The stipulation was that you should have scheduled them. But through no fault of his meals, they were not held. In fact, if you look at the emails. In the 1182 1189 range. There are in there. Those emails indications that they before they found out she was in the hospital. That they were going to reschedule those. Or a later date after March 18. So there's no thing in the record that suggests that she is stipulated to, or that she actually missed any field supervisions. With perspective, Lynn Tyndall. She said she went missing because she was in the hospital. She also said. That she made all of her field placements up to that time. And she made up all of the work thereafter. And we talk about. Your honor and. Those are, those are all those chin is unpublished. It's quite apt. He had good academic grades. They had separate grades for clinical. And the separate grades for clinical. He was getting ones and threes out of nine. In the separate grades for clinical here. She's getting fours and fives out of five. So. And the same thing is true. Everything about. Clinical presentations and his clinical performance. All of the evidence in this case. Every bit of it. Every last bit of it. Is that she was exemplary. In all of her clinical. There is not one. Age in this record that says otherwise. And lastly, judge, if I could have just a minute or two. Of indulgence. As Ms. I think this is important to this issue. She's a mental health professional. We've got to be careful. This is what. Her declaration. On many emotional mental disorders, including bipolar disorder. May impair a social worker's ability to effectively and safely deliver. Services to clients. The same disorder did not in any way disqualify. An otherwise qualified person. From practicing social work. When the symptoms of the disorder are adequately controlled by therapies. Including appropriate medication. Indeed, it is 1 of the missions of social work. To empower and facilitate persons who have been diagnosed with such disorders. You carry on normal contributing and working lives. And no less than professional careers and other occupations. This is even true when a social work professionals ability to safely and effectively provide service. Is occasionally compromised. I relapse. Or onset of symptoms. In such case, the code of ethics. Specifically provides. A resort to temporary cessation. A session of practice while appropriate care sought. And return to practice when that care has been successful. Lastly, this case is very unique in 1 other way. I don't think in any other case. Is there the degree of post dismissal evidence that we produced in this case? Because she was supposed to be allowed to participate. She was to a degree allowed to participate. And she was also able to secure the services. Not only of the. Appointed by ECU. But a previously appointed ECU field instructor. And they evaluated her. After the dismissal for all of her work. Using exactly the same standards and ECU applied. Exact same field manual. Exact same learning. And we have from that. Evidence in this case. That because she was able to perform appropriately and well. Post dismissal. That is evidence and probably the best evidence. Of whether or not the time she was dismissed. She could have done. Thank you, Mr. Barfield. We appreciate counsel. Argument. And under our normal procedures, which we're not. A hearing to right now. We wouldn't come down and. Be counseling. Shake hands with him. That you've done a good job right there. Well, I'll tell you from here that you've done a good job and we appreciate it very much. And good to have you here. Madam clerk. We'll take a brief. Break and you'll reconstitute the. Lawyers in here for the next case.
judges: Robert B. King, G. Steven Agee, Stephanie D. Thacker